**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 20-1765

BRUCE BERG, as an heir to Benjamin Katz, a partner in Firma D. Katz,

Plaintiff – Appellant,

v.

KINGDOM OF THE NETHERLANDS; MINISTRY OF EDUCATION CULTURE & SCIENCE OF THE NETHERLANDS; THE CULTURAL HERITAGE AGENCY OF THE NETHERLANDS; MUSEUM HET REMBRANDTHUIS, a/k/a Rembrandt House Museum; MUSEUM BOIJMANS VAN BEUNINGEN; THE FRANS HALS MUSEUM; THE CENTRAAL MUSEUM; MUSEUM CATHARIJNECONVENT; THE RIJKSMUSEUM; THE RIJKSMUSEUM TWENTHE; THE DORDRECHTS MUSEUM; MUSEUM DE LAKENHAL; MUSEUM GOUDA; MUSEUM VOOR RELIGIEUZE KUNST; THE BONNEFANTENMUSEUM; HET NOORDBRABANTS MUSEUM; THE LIMBURGS MUSEUM; PALEIS HET LOO; MUSEUM ONS' LIEVE HEER OP SOLDER; STICHTING BIJBELS MUSEUM; MUSEUM ROTTERDAM; MUSEUM HET PRINSENHOF; HISTORISCH CENTRUM HET MARKIEZENHOF,

Defendants – Appellees.

Appeal from the United States District Court for the District of South Carolina, at Charleston. Bruce H. Hendricks, District Judge. (2:18-cv-03123-BHH)

Argued: October 27, 2021                    Decided: February 3, 2022

Before RICHARDSON and QUATTLEBAUM, Circuit Judges, and Michael F. URBANSKI, Chief United States District Judge for the Western District of Virginia, sitting by designation.

Affirmed by published opinion. Judge Urbanski wrote the opinion, in which Judge Richardson and Judge Quattlebaum joined.

---

**ARGUED:** Daniel Woofter, GOLDSTEIN & RUSSELL, P.C., Bethesda, Maryland, for Appellant. Samuel Batiste Hartzell, WOMBLE BOND DICKINSON (US) LLP, Raleigh, North Carolina; Sarah Erickson Andre, NIXON PEABODY LLP, Los Angeles, California, for Appellees. **ON BRIEF:** Joel M. Androphy, Rebecca Lynne Gibson, BERG & ANDROPHY, Houston, Texas; E. Paul Gibson, E. PAUL GIBSON P.C., North Charleston, South Carolina, for Appellant. Brent F. Powell, WOMBLE BOND DICKINSON (US) LLP, Winston-Salem, North Carolina, for Appellees. Donald I. Baker, Lucy S. Clippinger, BAKER & MILLER PLLC, Washington, D.C., for Appellees Kingdom of the Netherlands, Ministry of Education, Culture & Science of the Netherlands, and Cultural Heritage Agency of the Netherlands. Thaddeus J. Stauber, Kristin M. Jamberdino, NIXON PEABODY LLP, Los Angeles, California, for Appellees Museum Het Rembrandthuis, a/k/a Rembrandt House Museum; Museum Boijmans Van Neuningen; Frans Hals Museum; Centraal Museum; Catharijneconvent; Rijksmuseum; Rijksmuseum Twenthe; Dordrechts Museum; Museum de Lakenhal; Museum Gouda; Museum Voor Religieuze Kunst; Bonnefantenmuseum; Het Noordbrabants Museum; Limburgs Museum; Paleis Het Loo; Museum Ons' Lieve Heer Op Solder; Stichting Bijbels Museum; Museum Rotterdam; Museum Het Prinsenhof and Historisch Centrum Het Markiezenhof.

URBANSKI, Chief District Judge:

Bruce Berg, a resident of South Carolina, brought suit for recovery of paintings and other works of art taken under duress by the Nazis following the German invasion of the Netherlands in 1940. At the time of the German invasion, Berg's grandfather, Benjamin Katz, was a partner in Firma D. Katz, which owned and operated three art galleries specializing in the sale of paintings by Dutch Old Masters. Following World War II, many of the stolen artworks were returned to the Netherlands by the United States military under Collection Point Agreements in which the Netherlands agreed to hold the art as "custodians pending the determination of the lawful owners thereof." *See*, *e.g.*, J.A. 100. Firma D. Katz was liquidated in 1974,[1] and the artworks have not been returned to the heirs of its partners, Benjamin and Nathan Katz.

Berg brought suit in the District of South Carolina against the Kingdom of the Netherlands; Ministry of Education, Culture & Science of the Netherlands ("Ministry"); Cultural Heritage Agency of the Netherlands ("RCE"); and several private and public municipal museums in the Netherlands holding the artworks.[2] Claiming ownership of the

---

[1] The amended complaint alleges that "Firma D. Katz was forced to liquidate as a result of 'Aryanization' policies in February of 1941. Firma D. Katz continued operations after that period with 'Aryan' owners as N.V. Schilderijen en Antiquiteitenhandel v/h Firma D. Katz." Am. Compl. ¶ 128. Benjamin Katz returned to the Netherlands after its liberation in May 1945, and took over the "Aryanized" Firma D. Katz on October 3, 1946. *Id.* at ¶ 144. Following Benjamin Katz's death in 1962, Firma D. Katz was liquidated in 1974. *Id.* at ¶ 157.

[2] The four public municipal museums are Dordrechts Museum, Museum de Lakenhal, Museum Het Prinsenhof, and Historisch Centrum Het Markiezenhof. The amended complaint seeks restitution for 143 paintings and other artworks, thirteen of which are alleged to be held in the municipal museums. Am. Compl. ¶¶ 37, 38, 48, and 49.

artworks, Berg brought claims for declaratory judgment, conversion, unjust enrichment, and constructive trust, arising from the alleged taking and retention of the artworks in violation of international law.

The district court considered a series of jurisdictional and procedural challenges to the amended complaint and granted Defendants' motion to dismiss on several grounds. First, the court held that the Ministry and RCE are political subdivisions of the Netherlands entitled to sovereign immunity under the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1602, *et seq*. Second, the court held that the municipal and private museums had insufficient contacts with South Carolina to support the court's exercise of personal jurisdiction. Third, the court concluded that venue was not proper in South Carolina as to the municipal and private museums. Fourth, the court concluded that the allegations of the amended complaint were insufficient to show that Berg had a legally cognizable interest providing him standing to sue.

Berg appealed some, but not all, of these rulings. At the outset, it is important to focus on the limited scope of this appeal. The Statement of Issues section of Berg's opening brief raised three issues on appeal:

1. Whether the Ministry and RCE are political subdivisions of the Netherlands for FSIA immunity purposes.

2. Whether the district court erred in holding that it had no personal jurisdiction over the municipal museums.

3. Whether the district court erred in holding that Berg lacked Article III standing.

Appellant's Opening Br. at 2.

The opening brief did not appeal the district court's dismissal of several party defendants, including the Kingdom of the Netherlands and the private museums. Nor did the opening brief directly raise as a ground for appeal the district court's dismissal for lack of venue over the municipal museums. Berg's opening brief mentions venue in passing on the last page of the Conclusion section, stating only: "That leaves one last reason for the District Court's dismissal: improper venue. Because the District Court's finding of improper venue was based solely on its personal jurisdiction holding, its dismissal based on venue does not pass muster." Appellant's Opening Br. at 54 (internal citation omitted). In a footnote, Berg added "[c]onsequently, if Plaintiff succeeds in this appeal, on remand, he will request transfer of this action to the U.S. District Court for the District of Columbia, where venue is proper under 28 U.S.C. § 1391(f)(4)." *Id.* at 54 n.42.

As such, this appeal concerns only two groups of defendants: (1) the Ministry and RCE, and (2) the four municipal museums. As to the Ministry and RCE, we affirm the district court's judgment that the Ministry and RCE, as political subdivisions of the Netherlands, are not subject to suit in federal court under the expropriation exception of the FSIA.[3] As to the municipal museums, we affirm their dismissal for lack of venue.

---

[3] The district court correctly concluded that the four municipal museums fell within the expropriation exception to FSIA as the artworks were taken by the Nazis in violation of international law, and that while the artworks were not present in the United States, the municipal museums owning or operating facilities holding those artworks were agencies or instrumentalities of the Netherlands engaged in commercial activity in the United States.

I.

Under the FSIA, "a federal court has subject matter jurisdiction over a claim against a foreign state only if that claim falls within one of the FSIA's exceptions to immunity." *Wye Oak Tech., Inc. v. Republic of Iraq*, 666 F.3d 205, 206 (4th Cir. 2011). As Berg's claim does not arise from commercial activity by defendants in the United States, the only applicable exception to sovereign immunity under the FSIA is the expropriation exception found in 28 U.S.C. § 1605(a)(3). The expropriation exception states:

> (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case—
>
> > (3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in commercial activity in the United States.

Because the artworks in question are not present in the United States, only the second clause of §1605(a)(3) applies here.

As the court explained in *Wye Oak*, "the FSIA applies to the component parts of a foreign state, distinguishing those that are legally separate from the foreign state from those that are not." 666 F.3d at 214. Under the dichotomy employed in the statute, legally separate agencies and instrumentalities may lose their sovereign immunity under the

6

second clause of the expropriation exception, while legally inseparable political subdivisions cannot.[4] The *Wye Oak* court explained:

> The FSIA applies not only to a foreign state, but also to that state's components . . . . 28 U.S.C. § 1603(a). After noting that the term "foreign state" includes a "political subdivision" thereof, the FSIA goes on to further differentiate an "agency or instrumentality" in terms that are significant to our discussion: an agency or instrumentality, under the FSIA, is "a separate legal person." *Id.* at § 1603(b)(1).
>
> As the statutory text attributes separate legal status only to an agency or instrumentality, which is, in turn, distinguished as a subset of "political subdivision," the FSIA creates a dichotomy in which a political subdivision does not have separate legal personhood unless it qualifies as an agency or instrumentality.

666 F.3d at 214. The court adopted a core functions test for distinguishing between a political subdivision and an agency or instrumentality.

> To determine whether an entity is an agency or instrumentality —and thus legally separate from the foreign state—or a mere political subdivision, courts ask "whether the core functions of the foreign entity are predominantly governmental or commercial." *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 151 (D.C. Cir. 1994). If the core functions are commercial, courts treat the entity as an agency or instrumentality—legally separate from the foreign state; if the core functions are governmental, courts treat the entity as a mere political subdivision—not legally separate from the foreign state. *Id.* at 153.

666 F.3d at 214–15.

---

[4] It is arguable that under the second clause of the expropriation exception, the commercial actions of an agency or instrumentality may abrogate the sovereign immunity of both that entity and any related foreign state or political subdivision. *See de Csepel v. Republic of Hungary*, 859 F.3d 1094, 1110–13 (D.C. Cir. 2017) ("*de Csepel I*") (Randolph, J., concurring in part). Berg argued for such an interpretation below but concedes the issue on appeal.

7

In applying the core functions test to the Ministry and RCE, the district court considered them together. Berg does not appeal this unitary analysis, as he conceded below "that the Agency [RCE] is a component of the Ministry which is 'not legally separable'" from it. As a result, because the Ministry is an agency or instrumentality of the Netherlands, so is the Agency." J.A. 995 (internal citation omitted). Consistently, in his opening brief on appeal, Berg stated, "The parties agreed that the RCE was part of the Ministry, so the District Court considered the core functions of the Ministry and RCE together." Appellant's Opening Br. at 22 n.23.

The Ministry was established by royal decree in 1965 and is one of twelve Dutch ministries, including the Ministry of Defence, Ministry of Finance, and Ministry of Foreign Affairs, reporting to the Prime Minister. Its responsibilities include primary and secondary education, vocational education, higher education, science, and cultural heritage. J.A. 746–47.

An organizational order of February 21, 2018, describes the functions of the Cultural Heritage Agency (RCE) as follows:

> On behalf of the Minister, the RCE implements legislation on heritage management and serves as a centre of expertise on the conservation of the Netherlands' historic buildings, archaeological heritage and cultivated landscapes. The Agency bears joint responsibility for developing policy and for implementing policy on cultural heritage. It serves as a knowledge institute on protecting valuable evidence of human habitation. The Agency also bears joint responsibility for developing and implementing policy on movable cultural heritage and is a centre of expertise in this area. On behalf of the Ministry of Education, Culture and Science, the Agency manages the part of central government's art collection that is not housed in national museums, and aims to make it as

8

accessible as possible. The Agency develops and disseminates information that supports and improves the management and preservations of the heritage collection and clarifies and raises awareness of its significance.

J.A. 749–50. As the district court noted, "the record leaves no doubt that the core function of the Ministry, and thus of RCE, is predominantly governmental." 2020 WL 2829757, at *7. We agree.

At the district court, Berg acknowledged that the "Ministry's core functions appear to be: (1) to set policy and regulate education, culture and media; and (2) to invest in research, the media, and cultural functions, and to fund artists." J.A. 994. Nevertheless, both at the district court and on appeal, Berg ignores the expansive scope of the Ministry's functions and takes a decidedly myopic view, focusing only on its "funding and investing in various initiatives," *id.* at 994, and "property management," Appellant's Opening Br. at 23–24. Because a private player in the market could engage in investment or property management, Berg argues that the Ministry's core function is commercial. But Berg's focus on this narrow aspect of the Ministry's broad functions runs contrary to the inquiry demanded by the core functions test—"whether the core functions of the foreign entity are predominantly governmental or commercial." *Wye Oak*, 666 F.3d at 214. Plainly, on this record, the core functions of the Ministry, encompassing all aspects of the government of the Netherlands relating to education, culture, and science, are predominantly governmental.

Other courts considering such issues have considered entities similar to the Ministry to be political subdivisions and applied FSIA immunity. In *Taylor v. Kingdom of Sweden*,

9

No. 18-1133 (RJL), 2019 WL 3536599 (D.D.C. Aug. 2, 2019), the court was faced with the question whether Sweden's National Museums of World Culture ("NMWC") was a political subdivision of Sweden. Taylor sought return of the personal possessions and certain remains of White Fox, a revered member of the Pawnee Nation who died while visiting Sweden in 1875. The district court noted that:

> Defendants have submitted persuasive (and undisputed) evidence demonstrating that NMWC's statutorily-defined core functions are an intrinsic part of Sweden's sovereign structure and governmental operation. Those functions include the promotion of Sweden's view of world culture to its own citizens and the international community as well as the country's ability to share that world view with people and institutions domestically and around the world.

*Id.* at *3. As such, the court concluded that "[t]he record in this case establishes that NMWC's 'core functions' are intertwined with Sweden's sovereign obligations such that NMWC is part of the foreign state." *Id.* at *4.

The plaintiffs in *Garb v. Republic of Poland*, 440 F. 3d 579 (2d Cir. 2006), sought redress for real property expropriated from Jewish persons and entities in post-War Poland. Faced with the issue of the application of the expropriation exception to FSIA immunity for agencies or instrumentalities, the Second Circuit affirmed the district court's ruling that Poland's Ministry of the Treasury was a political subdivision of the state and not an agency or instrumentality. Applying the core functions test, the Second Circuit agreed with the district court's finding "that the Ministry of the Treasury of Poland is 'an integral part of Poland's political structure' and that the Ministry's 'core function . . . is indisputably governmental' rather than commercial." *Id.* at 595. In so doing, the court concluded that

10

the district court's reasoning was not contradicted by the legislative history of the FSIA. *Id.* at 596–97; *see also Magness v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001) (applying core functions test for distinguishing service of process for political subdivisions under 28 U.S.C. § 1608(a) and agencies and instrumentalities under 28 U.S.C. § 1608(b), holding that "[u]nder this formulation, the Russian Ministry of Culture is governed by § 1608(a), while the Russian State Diamond Fund is a separate legal entity governed by § 1608(b)").

Berg relies on the decision of the district court in the District of Columbia in *de Csepel v. Republic of Hungary*, No. 1:10-cv-01261 (ESH), 2020 WL 2343405 (D.D.C. May 11, 2020) ("*de Csepel II*"). In that case, the descendants of a Jewish Hungarian art collector brought suit in the District of Columbia against the Republic of Hungary, its museums, and a state university to recover an art collection that was seized during World War II. Previous rulings in the case confirmed that the Republic of Hungary retained FSIA immunity. At issue in *de Csepel II* was whether a newly added defendant, Hungarian National Asset Management Inc. ("MNV"), was an agency or instrumentality of Hungary under the second clause of FSIA's expropriation exception. Applying the core functions test, the court noted that intelligence and security activities, for example, were almost always governmental rather than commercial, while entities such as a state trading company, a mining enterprise, or a steel company fell at the other end of the spectrum and were predominantly commercial. "In the middle are cases involving cultural and financial institutions." *Id.* at *7. In finding MNV to be predominantly commercial, the district court found that "[t]he non-governmental nature of MNV is apparent in light of Hungary's choice

11

several decades ago to transform its asset manager from a governmental agency into a joint-stock company to take advantage of the benefits of corporate law." *Id.* at *8. The *de Csepel II* court distinguished *Taylor* and *Garb* on the basis that the entities in those cases, unlike MNV, fell directly within the hierarchy of the national governments, "a category that is not congruent with 'agencies and instrumentalities.'" *Id.* (quoting *Garb*, 440 F.3d at 596).

Addressing the district court's opinion in this case, the *de Csepel II* court noted that "MNV's situation is factually distinguishable from that of the entities in *Berg*." *Id.* at *9. The Minister of Education, Culture and Science of the Netherlands reports to the Prime Minister, not to a board of directors, and there was no evidence that the commercial transactions in which the Ministry engaged resulted in individual profit. The *de Csepel II* court contrasted the Hungarian MNV which was overseen by a board of directors charged with ensuring the value-enhancing use of state assets. The court concluded:

> At their core, MNV's functions are those that a private entity could engage in as well. Moreover, MNV's placement outside of the Hungarian government, as a joint-stock company, further emphasizes its commercial, rather than governmental, nature. The Court thus concludes MNV is an "agency or instrumentality" of Hungary, not a political subdivision, and it loses its sovereign immunity pursuant to the second clause of the FSIA's expropriation exception.

*Id.* at *10. Unlike the plaintiffs in *de Csepel II*, the record is devoid of any suggestion by Berg that the Ministry has any separate identity from the government of the Netherlands. And while one aspect of RCE's functions—management of the Netherland's art collection—bears some similarity to the function performed in Hungary by MNV, the record reflects that this management is but one part of RCE's functional portfolio. *See* J.A.

12

749–50. Berg's focus on one aspect of the Ministry's overall function—relating to management of Dutch artworks—grossly understates the broader reach of the Ministry's governmental functions, encompassing Dutch national policy on education, science and cultural heritage.

Berg argues as well that the district court improperly focused on the structure of the Ministry, rather than its function. But as *Garb* and *de Csepel II* teach, structure informs function, and it was not improper for the district court to holistically assess the evidence regarding the Ministry's function. There is no evidence in this record suggesting that the Ministry is a separate legal person, and the district court properly concluded that the Ministry—and by stipulation RCE—is a political subdivision of the Netherlands entitled to FSIA immunity.

In sum, the record supports the district court's finding that the Ministry, and thus RCE, are political subdivisions of the Netherlands and do not lose FSIA immunity for artworks located outside of the United States which were expropriated in violation of international law.

## II.

As to the municipal museums, the district court dismissed the complaint against them for lack of venue.[5] Venue in civil actions against a foreign state is governed by 28

---

[5] The district court concluded that the municipal museums were agencies or instrumentalities of the Netherlands lacking sovereign immunity pursuant to the second clause of the FSIA's expropriation exception. That decision is not challenged on appeal and is consistent with the holding in *Altmann v. Republic of Austria*, 142 F. Supp. 2d 1187, 1204 (C.D. Cal. 2001) ("The paintings are owned by the Republic, but are exhibited by the

13

U.S.C. § 1391(f), and the district court found that subsection 1391(f)(3) governed the municipal museums as agencies or instrumentalities of the Netherlands.[6] That subsection permits venue in any judicial district in which an agency or instrumentality "is licensed to do business or is doing business." § 1391(f)(3). Though the district court found the municipal museums had engaged in commercial activity in the United States, the venue provision more narrowly focused on whether they did business in the District of South Carolina. So the allegations of nationwide solicitation and sales did little to show that the municipal museums are "doing business" in the District of South Carolina. 2020 WL 2829757, at *16. On appeal, Berg nowhere challenges this ruling.

Berg only obliquely addresses venue on the last page of the Conclusion section of his brief, stating "[b]ecause the District Court's finding of improper venue was based solely on its personal jurisdiction holding, its dismissal based on venue does not pass muster." Appellant's Opening Br. at 54. But the district court did not base its finding of improper venue as to the municipal museums on personal jurisdiction. As such, Berg's scant reference to venue is inapplicable to the district court's judgment as to the municipal museums. Rather, as to the municipal museums, the district court's ruling was based on the lack of sufficient allegations that the municipal museums did business in South Carolina as required by § 1391(f)(3). In contrast, the district court did base its venue ruling as to the

---

Gallery. The exhibition of these paintings fulfills the 'owned or operated by an agency of instrumentality' requirement. Therefore, Plaintiff's claim meets the 'owned or operated' requirement of the expropriation exception of the FSIA.") (internal citation omitted).

[6] As the district court correctly determined that the Ministry and RCE were entitled to sovereign immunity, it did not address venue for those entities.

*private* museums on its finding that personal jurisdiction was lacking as to them. But Berg did not appeal any aspect of the district court's judgment as to the private museums. In short, an assignment of error asserting that the district court's venue ruling did not "pass muster" because it "was based solely on its personal jurisdiction holding," does not challenge in any respect the district court's wholly separate finding that the amended complaint did not sufficiently allege that the municipal museums were doing business in South Carolina to establish venue under § 1391(f)(3).

Defendants filed a motion for summary affirmance arguing that the failure to challenge the dismissal of the municipal museums dooms his appeal as it relates to the municipal museums. *See Abdul-Mumit v. Alexandria Hyundai, LLC*, 896 F.3d 278, 290–91 (4th Cir. 2018) (dismissing appeal for failure to challenge all independent grounds for dismissal clearly presented by district court). In his response, Berg does not claim that the district court's venue ruling as to the municipal museums was erroneous.[7] Rather, he argues that following remand, venue should be transferred to the District of Columbia pursuant to 28 U.S.C. § 1406(a). Section 1406(a) provides that "[t]he district court of a district in which is filed a case laying venue in the wrong division or district shall dismiss, or if it be in the

---

[7] Consistently, in footnote 42 of his opening brief and in a one paragraph rejoinder in his reply brief, Berg does not argue that the district court's finding that venue did not exist as to the municipal museums under § 1391(f)(3) was wrong. Appellant's Opening Br. at 54; Appellant's Reply Br. at 19–20. Instead, Berg asks, for the first time, that this court directly transfer venue to the District of Columbia. While § 1391(f)(4) provides for venue "(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof," Berg did not invoke this section at the district court. In his Amended Complaint, Berg's sole venue allegation was that "[v]enue is proper in the District of South Carolina pursuant to 28 U.S.C. § 1391(f) because Defendants do business in the District of South Carolina." J.A. 53.

15

interest of justice, transfer such case to any district in which it could have been brought."

Relying principally on *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962), Berg notes that dismissal, rather than transfer, may limit the causes of action he may bring should he be required to refile in the District of Columbia because of the running of the statute of limitations. As such, he claims that this situation demands transfer, rather than dismissal.

In *Goldlawr*, the Eastern District of Pennsylvania transferred an antitrust case to the Southern District of New York under § 1406(a). After determining that the Pennsylvania district court lacked personal jurisdiction over defendants, the New York district court dismissed the action, concluding that the lack of personal jurisdiction deprived the Pennsylvania court of power under § 1406(a) to transfer the case. The Supreme Court disagreed, holding that the power to transfer a case under § 1406(a) was not "limited to actions in which the transferring court has personal jurisdiction over the defendants." 369 U.S. at 465. The Court explained:

> The problem which gave rise to the enactment of the section was that of avoiding the injustice which had often resulted to plaintiffs from dismissal of their actions merely because they had made an erroneous guess with regard to the existence of some elusive fact of the kind upon which venue provisions often turn. Indeed, this case is itself a typical example of the problem sought to be avoided, for dismissal here would have resulted in plaintiff's losing a substantial part of its cause of action under the statute of limitations merely because it made a mistake in thinking that the respondent corporations could be "found" or that they "transact * * * business" in the Eastern District of Pennsylvania. . . . The section is thus in accord with the general purpose which has prompted many of the procedural changes of the past few years—that of removing whatever obstacles may impede an expeditious and orderly adjudication of cases and controversies on their merits.

16

*Id.* at 466–67.[8]

In *Porter v. Groat*, 840 F.2d 255 (4th Cir. 1988), the Eastern District of Virginia declined to transfer a medical malpractice case to North Carolina because venue was proper in Virginia. Following *Goldlawr,* we reversed the denial of the transfer of venue, reasoning as follows:

> On these authorities we adopt as the rule in this circuit the reading of § 1406(a) that authorizes the transfer of a case to any district, which would have had venue if the case were originally brought there, for any reason which constitutes an impediment in the transferee district. Specifically, in the instant case, we read § 1406(a) to authorize the transfer to the Eastern District of North Carolina when the statute of limitations would bar adjudication on the merits in the Eastern District of Virginia but not in the Eastern District of North Carolina. Because we perceive it to be "in the interest of justice" for plaintiffs to have their day in court in North Carolina and we perceive no weighty countervailing reasons to deny transfer, we direct the district court on remand to grant the motion to transfer.

*Id.* at 258.

While these cases support the transfer, rather than dismissal, of actions for lack of venue in the interest of justice, they provide no solace to Berg. Unlike the plaintiffs in *Goldlawr*, *Internatio-Rotterdam*, and *Porter*, Berg never asked the district court to transfer venue to the District of Columbia. In fact, Berg argued below that the case should remain

---

[8] The Court in *Goldlawr* cited an earlier decision of this court in *Internatio-Rotterdam, Inc. v. Thomsen*, 218 F.2d 514, 517 (4th Cir. 1955), favoring transfer of venue, in which the court stated "[c]ertainly such transfer is in accord with modern standards of procedure, the purpose of which is to get away from time-consuming and justice-defeating technicalities and secure the adjudication of the rights of the parties by as direct and as expeditious a route as possible."

pending in South Carolina under § 1391(f)(3) and that venue was not mandatory in the District of Columbia under § 1391(f)(4). J.A. 1019–20. Thus, not only has Berg failed to argue on appeal that the district court's venue ruling as to the municipal museums was erroneous, he never asked the district court to transfer venue to the District of Columbia under § 1406(a). "As this court has repeatedly held, issues raised for the first time on appeal generally will not be considered." *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993) (citing *Nat'l Wildlife Fed. v. Hanson*, 859 F.2d 313, 318 (4th Cir. 1988); *Stewart v. Hall*, 770 F.2d 1267, 1271 (4th Cir. 1985); *Maynard v. Gen. Elec. Co.*, 486 F.2d 538, 539 (4th Cir. 1973)). The district court's dismissal for lack of venue over the municipal museums is forfeited. Nothing in this record suggests that the district court's venue ruling as to the municipal museums constitutes fundamental error or results in a miscarriage of justice warranting reversal.

Finally, in his opposition to the motion for summary affirmance, Berg asks the court to excuse his abandonment of the venue issue on appeal and order transfer of venue directly. Berg's request, however, ignores the fact that his failure to challenge the venue ruling as to the municipal museums leaves no defendants remaining as to which venue transfer would be appropriate. Again, Berg did not appeal the dismissal of the Kingdom of the Netherlands or the private museums. Because the Ministry and RCE are not subject to suit under the FSIA, the only remaining defendants on appeal are the four municipal museums, holding only a fraction of the disputed artworks. The district court dismissed Berg's suit against the municipal museums on multiple grounds, including improper venue. As the district court's venue holding as to the municipal museums was not appealed, no

18

defendants remain to be transferred. It bears reemphasizing that Berg not only failed to appeal the venue ruling as to the municipal museums, he failed in the first instance to ask the district court to transfer venue to the District of Columbia. Under these unusual circumstances, the court cannot resuscitate Berg's dismissed claim as to the municipal museums and transfer venue to the District of Columbia.[9]

## III.

To be sure, Berg's claim that the Nazi regime stole art owned by his grandfather's partnership presents a strong moral claim. However, as the Second Circuit noted in *Garb v. Republic of Poland*, "strong moral claims are not easily converted into successful legal causes of action." 440 F.3d at 581 (internal citation omitted). "Despite the severe injuries asserted by [Berg], the capacity of United States courts to exercise jurisdiction over plaintiff[']s claims hinges on a legal inquiry narrowly circumscribed by statute." *Id.* Because the Ministry and RCE are political subdivisions of the Netherlands, the FSIA bars suit against them. While claims against the municipal museums, as agents and instrumentalities of the Netherlands, fall within the expropriation exception to the FSIA, as for venue, it is improper in South Carolina. As Berg did not ask the district court to transfer venue or otherwise appeal the venue ruling as to the municipal museums, the district court's ruling as to venue compels affirmance of the judgment below.

---

[9] Because the district court's unassailable finding of lack of venue in South Carolina provides an independent basis for dismissal and was not appealed, the court need not address the district court's finding of lack of personal jurisdiction over the municipal museums and Berg's lack of standing.

*AFFIRMED*